IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CLARE E. YINGST,** | : | |
| **Plaintiff** | : | **Civil No. 1:12-CV-1803** |
| | : | |
| **v.** | : | |
| | : | |
| **TEXAS NEW MEXICO** | : | |
| **NEWSPAPER PARTNERSHIP,** | : | |
| **t/d/b/a LEBANON DAILY NEWS;** | : | |
| **NORTHWEST NEW MEXICO** | : | |
| **NEWSPAPER PARTNERSHIP,** | : | |
| **a wholly owned subsidiary of** | : | |
| **MEDIANEWS GROUP, INC.; and** | : | |
| **MEDIANEWS GROUP, INC.,** | : | |
| | : | **Judge Sylvia H. Rambo** |
| **Defendants** | : | |

# M E M O R A N D U M

In this employment discrimination action, Plaintiff, a former employee of Defendants, alleged that she was discriminated against because of her age when her employment was terminated in violation of the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act. Presently before the court is Defendants' motion for summary judgment (Doc. 23), wherein Defendants contend that Plaintiff cannot establish that the legitimate non-discriminatory basis for her termination was a pretext and, alternatively, that Plaintiff failed to mitigate her damages and therefore cannot recover front pay. For the following reasons, Defendants' motion will be denied.

## I.        Background

The claims in this case are based largely upon the events underlying Defendants' decision to terminate Plaintiff's employment, which was supposedly based upon Plaintiff's forging clients' signatures on replacement contracts and the allegedly feigned investigation conducted by Defendants in connection thereto. The following facts are undisputed or, where disputed, reflect Plaintiff's version of facts in the record, pursuant to this court's duty to view all facts and reasonable inferences

in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

## A.   Facts

Plaintiff, Clare Yingst, who at all times relevant to this litigation was a member of the class of individuals protected against age-based discrimination in the workplace, was hired on October 21, 1996, by Defendant Lebanon Daily News ("Defendant LDN"), an entity owned by Defendant Texas New Mexico Newspapers Partnership ("Defendant Tex Mex"), as a Classified Advertising Manager.  (Doc. 24, ¶¶ 5-7, 9-12, 36.)  Plaintiff was employed in that capacity until she resigned at Defendant LDN's direction on February 3, 2010.[1]  (*Id.* at ¶ 1.)  Plaintiff's job duties included, *inter alia*, servicing advertising clients, facilitating the purchase of advertising space by clients, assisting with the creation of advertisements, authorizing the placement of advertisements, selling advertising and marketing plans, and overseeing financial billing.  (*See id.* at ¶¶ 37-39.)

Although she did not have direct authority to fire Plaintiff, Nicole Goodyear Natale ("Goodyear"), who was 33 years old at the time Plaintiff's employment was terminated, was in a supervisory position over Plaintiff.[2]  (*See id.* at ¶ 41; Doc. 31, ¶ 41.)  Goodyear was employed by Defendant LDN as an Advertising Manager from 2008 until early 2011, and was thereafter a sales representative until

---

[1]  Plaintiff disputes that she was terminated on February 3, 2010, the date on which she signed her resignation letter at David Smith's insistence (*see* Doc. 32-3, p. 37 of 41), and instead argues that she was terminated on February 22, 2010, the date on which she was notified that her resignation letter was accepted by Defendant LDN (*see* Doc. 32-10, p. 41 of 44).  The record supports a conclusion that the adverse employment action, *i.e.,* Plaintiff's resignation at the insistence of Defendant LDN, occurred on February 3, 2010, when she signed the resignation letter prepared by Smith.

[2]  Goodyear had supervisory authority over all of the employees in the advertising department, including Plaintiff.  However, she did not have the ability to hire, fire, promote, demote, or transfer advertising sales representatives, although she did have the authority to impose discipline in conjunction with Jean Taylor and David Smith.  (Doc. 31, ¶ 41.)

her resignation in April 2011. (Doc. 24, ¶ 23.) As Advertising Manager, Goodyear was responsible for training new sales representatives, placing employment notices, conducting interviews for new sales representatives, and recommending disposition of disciplinary issues. (*Id.* at ¶ 24.) Goodyear reported to David Smith, the former Publisher at LDN, who was responsible for overseeing and managing LDN's operations, personnel, financials, and distribution of the newspaper. (*Id.* at ¶ 26.)

## 1.   <u>Ageist culture at Defendant LDN</u>

Several employees testified that an ageist and sexist corporate culture existed at LGN. Plaintiff testified that, on several occasions, Goodyear made comments highlighting the value of working with "young, hot chicks" and that "young sex sells." (*See* Doc. 32-2, p. 18 of 44.) Evidence in the record tends to establish that Goodyear encouraged provocative dress for the younger female employees but did not suggest the same to older employees, including Plaintiff, characterizing them as old. (Doc. 32-5, p. 24 of 28.) To this end, Colleen Novak, an outside sales representative who is two years younger than Plaintiff, testified that she heard Goodyear say that "if [Defendant LDN] got somebody younger [in the advertising sales department], somebody that could wear short skirts, somebody that could have their parts hanging out, that [advertising revenue] would probably come up." (*Id.* at pp. 4-5 of 28.) Cheryl Brewer, an outside sales representative who is more than six years younger than Plaintiff, corroborated the testimony of other employees regarding Goodyear's endorsing provocative dress by younger female employees and testified that Goodyear called her "an old fart." (Doc. 32-7, p. 9 of 19.) Brewer also testified that Goodyear made age-based comments to others, including Plaintiff. (*Id.*) Smith was often present when these comments were made. (*Id.*)

3

Evidence of record also establishes that Smith treated the younger employees differently than those older, including telling jokes to younger employees that painted older persons "in a negative light." (*See* Doc. 32-11, p. 20 of 25.) Specifically, Kristina Kolb, a former graphic designer at LDN, testified that Smith never joked at the expense of any particular individual, but certainly demonstrated a preference for the people with whom he associated (*see id.*), especially gravitating toward Goodyear despite his knowledge that other employees complained of Goodyear's deficiencies as a manager (*see* Doc. 32-7, pp. 3-4 of 19; Doc. 32-5, p. 16 of 28).

## 2.   <u>Advertising contracts</u>

Historically, Plaintiff did not have advertising clients sign annual contracts in every instance. (Doc. 24, ¶ 57.) However, from mid-2009 through 2010, Defendants engaged in a process aimed at centralizing the sales functions of all newspapers owned by MediaOnePA,[3] including Defendant LDN, which occasioned Defendants implementing a new front-end computer system for advertising functions for MediaOnePA, including, *inter alia*, advertising information, schedules, rates, and contracts. (*Id.* at ¶¶ 54, 55.) Each individual newspaper was responsible for ensuring that all rate information and all advertising contracts were delivered to the advertising department at Defendants' central York regional office (*see id.* at ¶ 14) to be inputted into a new centralized computer system known as Mactive (*id.* at ¶ 56). As part of the implementation of the Mactive system, advertising representatives, including Plaintiff, were required to complete and submit signed contracts from all

---

[3] MediaOnePA is a newspaper market operated by Media News Group Inc. ("Defendant MNG"), a Delaware Corporation that, at all times relevant to the facts giving rise to the instant case, owned a controlling interest in Defendant Tex Mex. (Doc. 24, ¶¶ 10, 13.)

advertisers, a requirement of which Plaintiff was notified during the summer of 2009 and had to have completed by the end of the calendar year. (*Id.* at ¶¶ 58-60.)

In late January 2010, Goodyear informed Plaintiff that the regional office had lost the contracts that Plaintiff had earlier procured. (Doc. 32-2, p. 26 of 44.) Goodyear further told Plaintiff that Plaintiff needed to "get [the contracts] signed again" because, otherwise, the advertisements Plaintiff had procured would not be billed. (*Id.*) Plaintiff testified that Goodyear directed her to have the signed contracts before a meeting at the regional office, and reminded Plaintiff of the requirement numerous times. (*See id.* at p. 28 of 44.) According to Plaintiff, Goodyear told her that the regional office was "going to ream [Goodyear's] ass out if [Goodyear did not] have them," to which Plaintiff responded that she did not have them all signed, and questioned whether Goodyear wanted her to sign the contracts. (*Id.*) Plaintiff testified that Goodyear told her to sign the contracts and that they would "swap them out when [they received the properly executed contracts]." (*Id.*) Plaintiff admitted that she did forge the signatures of advertisers on several of the replacement advertising contracts.[4]  (Doc. 32-2, pp. 15-16 of 44.)  Plaintiff produced

---

[4]  In her responsive statement of facts, Plaintiff denies that she forged the signatures of advertising clients. (*See* Doc. 31, ¶ 69.) Although disputes are typically viewed in the light most favorable to the nonmoving party, denials in contradiction to the facts of record do not qualify as genuine disputes. During her deposition, Plaintiff testified as follows:

[By Plaintiff]: I was terminated because my supervisor, [Goodyear], told me that they, York, needed coding information and that York lost my original contracts which were completed and they needed the information to plug in the computer. *So I filled out that information. And, yes, I did sign their names because that was the contact person. That is what happened.*

Q:     I'm referring to the specific action, just the signing.

[By Plaintiff]: Yes, I did, I signed, yes, I did.

(Doc. 32-2, pp. 15-16 of 44 (emphasis supplied).)  Plaintiff's "specific[ ] den[ial] that [she] forged [the signatures of advertisers on advertising] contracts" (Doc. 31, ¶ 69) is, at best, a matter of semantics.

(continued...)

the forged contracts to Goodyear, who in turn delivered the replacement contracts with the signatures to Doug Cooper, the Advertising Director for the York Newspaper Company and the point person for the implementation of the Mactive system for Defendant LDN.  (Doc. 24, ¶ 69; Doc. 31, ¶ 46.)  Cooper reviewed the contracts and immediately noticed that each appeared to be signed by the same person.  (Doc. 24, ¶ 70.)  Cooper immediately took the contracts to his supervisor, Frederick Uffelman, the former president and Chief Executive Officer of MediaOne, and asked Uffelman whether he noticed anything odd about the contracts.  (*Id.* at ¶¶ 71-72.)  Uffelman shared Cooper's suspicion and told Cooper that the contracts all appeared to be signed by the same person.  (*Id.* at ¶ 73.)  Uffelman then directed Smith to investigate the matter.  (*Id.* at ¶ 74.)

Following Uffelman's direction, Smith reviewed the contracts and noticed that the handwriting on the signatures belonged to Plaintiff.  (*Id.* at ¶ 75.)  Smith met with Plaintiff to discuss the contracts on February 3, 2010.  (Doc. 32-2, p. 34 of 44.)  Plaintiff recounted that meeting, during which Goodyear was also present (Doc. 24, ¶ 77), as follows:

> I was at work.  Dave Smith called me into his office. I walked in and [Smith] was behind his desk. [Goodyear] was sitting there on the right hand side, and I took a seat on the left.  And [Smith] said with his hands behind his head, he was sitting there and he said, [Plaintiff], we have a problem.  And I said, what's the problem, [Smith].  And he said that York noticed that all the contracts that I sent down had the same signature on them.  And I said, yeah, they did, I signed them.  And he said, are you admitting you signed them.  *And I said, yeah, she told me to, pointing to*

---

⁴(...continued)
However, the court does agree with Plaintiff that it is relevant whether the forged documents were replacement contracts.  (*See* Doc. 31, p. 9 n.13 of 39.)  To the extent this fact is disputed by Defendants, the court resolves the dispute in Plaintiff's favor and assumes, for purposes of the instant motion, that the contracts were replacements of contracts properly executed by the advertisers.

> *[Goodyear].  She was sitting there.  I said, yeah, she told me to sign them*.
>
> And [Goodyear] said, yeah, I know how – This is what [Goodyear] said, yeah, I know how hard it is for [Plaintiff] to get ahold of these auto dealers like Ebersole's.  And [Smith] said – And she said Brandon Cave, I know how hard it is.  Then [Smith] said, well, I don't know what we're going to do about this.  And I said something – I don't know what to do about this, you know, you signing these.  And I said, well, [Smith], they all signed them already, they signed them last year.
>
> And then that – You know, that was basically the end of the conversation.  He said that he doesn't know what's going to happen, I don't know what's going to happen here, I don't know what I can do for you.  And that was the end of that meeting.
>
> \*   \*   \*
>
> [Smith] just said that, you know, I can't sign other people's names and that it was illegal.

(Doc. 32-2, p. 34 of 44 (emphasis supplied).)  Smith's memorandum memorializing his meetings with regard to the forged contracts set forth a slightly different account of Plaintiff's position:

> [Plaintiff] did not deny [that she signed customers' names to advertising contracts] and fully acknowledged doing so, insisting that she was simply following the instructions of *the advertiser*.
>
> She insisted that in each case, the advertiser stated "that's what I agreed to, that's what we're already doing, just sign my name to the contract" so that's what she did.
>
> [Plaintiff] insisted that she saw nothing wrong with her actions, *because that's what the advertiser wanted*.
>
> \*   \*   \*
>
> She pointed out that she advised [Goodyear] about Brandon Cave at Ebersole's refusing to sign a contract because "they have been dealing with [Defendant LDN] for

> 90 years and he's not going to sign a contract now[."]
> [Goodyear] acknowledged that conversation, but pointed
> out that they attached a copy of an email from Brandon that
> he was agreeing to the terms.
>
> [Plaintiff] stated that the company just had to
> understand that "this [is] Lebanon and that's the way these
> people are[."]

(Doc. 24-3, p. 49 of 89 (emphasis supplied).)

Following his meeting with Plaintiff, Smith met with Uffelman to discuss Plaintiff's actions related to the forged contracts, and he and Uffelman agreed that "what [Plaintiff] ha[d] done in signing these contracts [was] both ethically and legally wrong and just [could not] be tolerated." (*See id.*) Ultimately, Smith and Uffelman decided to terminate Plaintiff's employment, and Uffelman agreed to allow Plaintiff to resign in lieu of involuntary termination and to provide Plaintiff with two weeks of normal pay in addition to an agreement not to challenge any claim for unemployment benefits. (*Id.*) These terms were presented to Plaintiff during a meeting on the afternoon of February 3, 2010. (*See id.* at p. 50 of 89.) Smith memorialized this meeting with Plaintiff in an internal report as follows:

> I met with [Plaintiff] with Jean Taylor[, the Business
> Office Manager and Human Resources Official at
> Defendant LDN,] present to inform her of our decision to
> terminate her employment with [Defendant LDN]. I fully
> explained that signing an advertiser[']s name to a contract
> was totally improper and highly illegal and that we could
> absolutely not tolerate that practice.
>
> [Plaintiff] expressed shock saying "I can't believe
> this, *I did what the advertiser told me to do*, in fact some of
> them have faxed me copies of signed contracts today." I
> explained again that I found it highly irregular that
> someone with such a penchant for contracts as Realtors and
> Auto Dealers would even suggest that someone else sign
> their name, but even so, I found it unbelievable that she

would feel it was proper.  Again she said "I was just doing what the *customer* wanted[."]

I presented her with the opportunity to resign in lieu of termination, with two weeks pay plus any commissions and bonuses due through February 3, 2010.  Further, we would agree that our response to any inquiry about Unemployment would be that she had resigned in lieu of involuntary termination for reason other than misconduct and that we would not contest her eligibility for those benefits.

(*Id.* at p. 50 of 89 (emphasis supplied).)  While Plaintiff was discussing the offer on the telephone with an attorney, Novak informed Smith that Goodyear had directed Plaintiff to sign the replacement contracts on behalf of the advertisers:

While [Plaintif was speaking with her attorney], Colleen Novak stormed in, asked Jean [Taylor] to leave and said she was aware of what we were doing and wanted to talk.  I told her that I was discussing nothing with her, but she wanted to make a statement that she absolutely heard [Goodyear] tell [Plaintiff] to sign the contracts and get them in so she ([Goodyear]) didn't get "nailed by York["] and if [Plaintiff] was guilty of fraud "[Goodyear] better [be] accused of fraud too[."]  Interestingly, at no time has [Plaintiff] alleged that [Goodyear] instructed her to sign the customers['] names to the contracts; in fact she has continually insisted that she did it at the instruction of the advertisers.

(*Id.*)  Smith's report regarding Plaintiff's termination is entirely devoid of any indication that Plaintiff alleged that Goodyear had instructed her to sign the advertisers' names on the contracts (*id.*),[5] despite Plaintiff testifying that she had

---

[5]  In response to Plaintiff's February 3, 2010 email, discussed *infra*, Smith drafted the following statement:

The claim that Nicky Goodyear instructed [Plaintiff] to sign customer's names to the contract was never mentioned in [Plaintiff]'s discussions of or in her defense of her actions.  She steadfastly claimed that individual advertisers, some of which she named by name, had personally instructed her to sign their

(continued...)

alleged Goodyear had instructed her during both the first and second meetings with Smith (*see* Doc. 32-2, p. 40 of 44; *see also* Doc. 24, ¶ 113).  Taylor, who was present during the second meeting, similarly did not recall Plaintiff alleging that Goodyear had directed Plaintiff to sign the contracts.  (*See* Doc. 24-3, p. 54 of 89.)  Plaintiff ultimately accepted the offer to resign in lieu of termination.  (*Id*. at p. 50 of 89)  Shortly thereafter, Novak placed a written statement on Smith's desk reiterating that Goodyear had instructed Plaintiff to sign the contracts.  (*Id*.)  Goodyear has, at all times relevant to this litigation, maintained that she never instructed Plaintiff to forge the signatures of her advertising clients on the contracts.  (*Id.* at p. 62 of 89.)

During that evening, Plaintiff authored an email to Defendant LDN contending that she was coerced into signing the letter of resignation and justified her reasons for forging the advertisers' signatures on the contracts:

> I was told my [sic] by my immediate supervisor, Nicole Goodyear, that the management in York needed annual contracts signed again.  I had this accomplished with the actual signatures in December 2009.  A few weeks later, my immediate supervisor, Nicole Goodyear, informed me that York LOST them.  Thursday or Friday, January 28 or 29th, my immediate supervisor, Nicole Goodyear, told me she had a meeting in York on Monday

---

[5](...continued)
name to the documents.  It was not until Colleen [Novak] had a sudden recollection of events, that such a claim was raised and it was raised by Colleen [Novak] herself, not [Plaintiff].

I have discussed the latest claim with Nicky [Goodyear], who found it bizarre and immediately pointed out that not only was it untrue, but [Plaintiff] had said [on February 3, 2010] that the advertisers had requested that she sign the documents.  Nicky [Goodyear] also said that it was the rate schedules (which [Plaintiff] also submitted late) that [were] supposedly lost in York and not the contracts.

Nicky [Goodyear] confirmed that she did indeed make a statement about "being tired of getting her a** reamed out" for the contracts not being completed but never suggested that [Plaintiff] forge customers['] names to them.

(Doc. 24-3, p. 60 of 89.)

Feb. 1st. She said York is going nuts! They want these signed contracts. I told Nicole [Goodyear] that I could not get them signed immediately, I told her I would sign the contracts with my customers['] names until we could get the customers to sign them again! Nicole Goodyear, my supervisor, said, "That's okay Clare. Just sign them. They are going to nail me in York if I don't get them in...." They are going to ream my ass out if it's not done now!" (N. Goodyear per verbatim.) Nicole Goodyear watched as I signed these contracts. Since she is my immediate supervisor, I did as I was instructed. I have three witnesses that heard this exchange, at least! In addition, I received verbal permission in December from my clients to sign their names to the contracts to continue their advertising at their current contracted rate.

For fear of losing my job, I followed my supervisor[']s, Nicole Goodyear, direct orders. If I am guilty of fraud, then isn't my supervisor, Nicole Goodyear, guilty also?"

(*Id.* at p. 52 of 59.) In response to Plaintiff's email, Taylor contacted Plaintiff on February 4, 2010 and February 5, 2010, to gather additional information regarding Plaintiff's allegations. (*See* Doc. 24, ¶ 105; Doc. 24-3, pp. 54-55 of 89.) Ultimately, Plaintiff withheld the identities of the alleged corroborating witnesses aside from Novak. (Doc. 24-1, p. 33 of 45; Doc. 32-1, p. 15 of 28.) An investigation never officially commenced due to difficulties in obtaining additional information (*see* Doc. 32-1, pp. 5, 16 of 28), and Taylor never spoke with Novak regarding Goodyear's allegedly instructing Plaintiff to sign the contracts (*see id.* at p. 16 of 28). On February 22, 2010, Smith sent Plaintiff a letter accepting her February 3, 2010 resignation and indicating that Plaintiff had failed to respond to Defendant LDN's request for additional information regarding Plaintiff's February 3, 2010 email. (Doc. 24-3, p. 58 of 89.) Following the termination of Plaintiff's employment, Plaintiff's job responsibilities were assumed by two individuals within the

11

advertising department of Defendant LDN, both of whom were under forty years old. (Doc. 24, ¶ 53.)

In the summer of 2010, the original contracts that Plaintiff claimed she had submitted were found in Goodyear's office. (Doc. 32-8, p. 11 of 24.) Goodyear remained employed at Defendant LDN until she resigned in April 2011. (Doc. 24, ¶ 112.) Plaintiff remained unemployed until she received a job offer for a business development position from Bruce K. Darkes & Associates, C.P.A., at the end of 2011, which commenced in March 2012. (*See* Doc. 24-5, p. 10 of 72.) In that capacity, Plaintiff makes ten dollars per hour. (*Id.*)

### C.   **Administrative proceedings**

Plaintiff timely filed a complaint with the Pennsylvania Human Relations Commission ("PHRC"), which was dual-filed with the United States Equal Employment Opportunity Commission ("EEOC"). (Doc. 1, ¶ 10; Doc. 10; ¶ 10.) On June 13, 2012, the EEOC notified Plaintiff of her right to sue. (Doc. 24, ¶ 4.)

## II.    **Procedural History**

Plaintiff initiated this action on September 10, 2012, by filing a two-count complaint alleging that she was subject to discrimination and disparate treatment on the basis of her age when her employment was terminated in February 2010, which she contends was in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 (Count II). Defendants filed their answer on November 9, 2012. (Doc. 10.) The parties have engaged in significant discovery pursuant to an amended case management order. (*See* Docs. 16 & 20.)

On February 17, 2014, Defendants filed the instant motion for summary judgment (Doc. 23), statement of material facts (Doc. 24), and brief in support (Doc. 25). Defendants argue that Plaintiff cannot establish that the legitimate non-

discriminatory basis for Defendant LDN's termination of Plaintiff's employment was a pretext and, alternatively, that Plaintiff failed to mitigate her damages. (*Id.*)  On March 11, 2014, Plaintiff filed a brief in opposition (Doc. 30) and responsive statement of facts (Doc. 31).  Defendants filed a reply brief on March 26, 2014. (Doc. 35.)  Thus, this matter has been fully briefed and is appropriate for consideration.

## III.        <u>Legal Standard</u>

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party has demonstrated an absence of material fact, the nonmoving party then must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Essentially, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court must draw all reasonable inferences in favor of the nonmovant. *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmoving party on that issue. *Davis v. National R.R. Passenger Corp.*, 733 F. Supp. 2d 474, 485 (D. Del. 2010) (citing *Anderson*, 477 U.S. at 249).  With respect to summary judgment in employment discrimination cases, the court's role is "to determine whether, upon

reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the [nonmoving party], there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Id.* (citing *Revis v. Slocomb Indus.*, 814 F. Supp. 1209, 1215 (D. Del 1993)).

## IV.      **Discussion**

Plaintiff alleges that Defendants discriminated against her based on her age. Defendants contend that they are entitled to summary judgment on both of Plaintiff's claims, contending that Plaintiff cannot establish that she was terminated for a discriminatory reason rather than her forging customers' signatures. Assuming *arguendo* that the court denies Defendants' motion for summary judgment on this basis, Defendants contend that Plaintiff has failed to offer evidence sufficient to support a conclusion that she mitigated her damages and, thus, should be precluded from an award of front pay. The court will address each argument in turn.

### A.      **Discrimination in violation of the ADEA and PHRA**

The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The Pennsylvania Human Relations Act ("PHRA") provides that it is "an unlawful discriminatory practice . . . [f]or any employer because of the . . . age . . . of any individual . . . to otherwise discriminat[e] against such individual . . . with respect to compensation, hire, tenure . . . if the individual . . . is the best able and most competent to perform the services required." 43 P.S. § 955(a). To prevail on a claim of intentional discrimination under either the ADEA or the PHRA, "a plaintiff must show that his or her age 'actually motivated'

14

or 'had a determinative influence on' the employer's adverse employment decision." *Fasold v. Justice*, 409 F.3d 178, 183 (3d Cir. 2005).

ADEA and PHRA claims are litigated according to the burden-shifting framework developed for Title VII claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (approving of the "continued application of the *McDonnell Douglas* paradigm in age discrimination cases"); *see also Wilson v. Mobilex USA Inc.*, 406 F. App'x 625, 626 (3d Cir. 2011) ("ADEA . . . claims are governed by the familiar burden-shifting framework set out in *McDonnell Douglas*."); *Fasold*, 409 F.3d at 183-84 (holding that ADEA and PHRA claims proceed under the *McDonnell Douglas* framework). First, the plaintiff must establish a prima facie case of age discrimination. *Smith*, 589 F.3d at 689. After doing so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Fasold*, 409 F.3d at 184. If a legitimate nondiscriminatory reason is provided, the plaintiff must present evidence to demonstrate that the defendant's proffered reasons were not its true reasons, but were merely a pretext for its illegal action. *Smith*, 589 F.3d at 691. The plaintiff can prove pretext by submitting evidence that allows a factfinder to either disbelieve the employer's articulated legitimate justification, or to conclude that an invidious discriminatory reason was more likely than not a "but for" cause of the employment action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *see also Keller v. Orix Credit Alliance Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (applying *Fuentes* in ADEA context). To accomplish this, a plaintiff must show that a defendant's reasons are so weak, incoherent, implausible, or inconsistent that they lack credibility. *See Fuentes*, 32 F.3d at 765. Regardless of the method, the plaintiff's evidence must allow a reasonable jury to find, by a preponderance of the evidence, that age discrimination

was a "but for" cause for the adverse employment action.  *Abels v. DISH Network Serv. LLC*, 507 F. App'x 179, 183 (3d Cir. 2012) (citing *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 177-78 (2009)).

To establish her prima facie case of age discrimination under the ADEA, a plaintiff must satisfy four elements: (1) she is at least forty years of age; (2) she is qualified for the position in question; (3) she has suffered an adverse employment action; and (4) she has been replaced by a sufficiently younger employee to permit a reasonable inference of age discrimination.  *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995)  The court agrees with the parties that Plaintiff has established a prima facie case of age discrimination.  It is undisputed that Plaintiff was over the age of forty, that she was qualified for the position because she had been employed by Defendant LDN for well over a decade, that she was terminated, and that her duties were assumed by a younger individual.  Thus, the analysis shifts to the next step.

Here, Defendants' proffered justification for terminating Plaintiff is her forging advertisers' signatures on customer contracts, thus sustaining their burden at step two.  Defendants contend that Plaintiff cannot meet her burden at step three of proving that this proffered reason was merely a pretext for unlawful age discrimination.  In particular, Defendants insist that whether the forged contracts were replacements or whether Goodyear instructed Plaintiff to forge the contracts are irrelevant and argue that any age-related comments made by Goodyear or Smith are merely stray comments, made in temporal isolation before Plaintiff's dismissal and do not help Plaintiff to show pretext.

The court, however, finds that the record is adequate to support a finding by a reasonable factfinder that Defendants' proffered explanations are pretextual.  Plaintiff disputes the adequacy of Defendant LDN's investigation into

Plaintiff's signing of the contracts which Defendants contend formed the basis for terminating Plaintiff's employment.  There is evidence of record, when viewed in the light most favorable to Plaintiff, to permit the finding that Defendants' decision to terminate Plaintiff's employment is unworthy of credence, given Defendant LDN's failure to conduct a thorough investigation into the circumstances underlying Plaintiff's signing the customer contracts despite having evidence that Goodyear, a younger employee who had authority over Plaintiff, directed Plaintiff's actions that formed the proffered reason for the termination of Plaintiff's employment.

The record contains sufficient evidence to establish that an ageist corporate culture existed at Defendant LDN.  Several employees testified that Goodyear preferred "young, hot chicks" to work with Defendant LDN's advertising customers, and encouraged these types of employees to dress provocatively, as it gave the newspaper a competitive edge.  Goodyear made derogatory age-based comments.  Smith primarily associated with younger employees, including telling jokes at the expense of older individuals that may be deemed inappropriate for the workplace.

In *Steward*, the Third Circuit stated that "remarks made by supervisors directly involved in the termination decision at issue can be evidence of their discriminatory animus, even if the remarks were not made in connection with the termination decision."  *Steward v. Sears Roebuck & Co.*, 231 F. App'x 201, 211 (3d Cir. 2007).  In *Steward*, the comment at issue was "Hell, you are old enough, you have been around long enough, you should handle this."  *Id*. at 211.  The Third Circuit concluded that a reasonable factfinder could infer that the remark reflected age bias and that it certainly reflected the employer's awareness of the plaintiff's age. *Id*.

When the age-conscious comments are viewed in conjunction with the facts that Defendant LDN's staff largely consisted of young, attractive women and that Goodyear encouraged younger employees to dress provocatively, a reasonable jury could conclude that Goodyear, in endorsing her philosophy that "young, hot chicks" sell advertising contracts, was, in essence, expressing a preference for young, attractive employees.  A factfinder can infer that the decision regarding Plaintiff's employment was made because Plaintiff did not fit into Defendant LDN's preferred mold and that Plaintiff's actions related to the contracts merely provided Defendant LDN with an opportunity to replace her with someone younger.

Moreover, while it remains a question of fact whether Goodyear actually directed Plaintiff to sign customer names to the advertising contracts and whether Smith knew of Goodyear's role in this regard, when viewing the facts in the light most favorable to Plaintiff, the court must take as true, for purposes of the instant motion, that Smith was aware that Goodyear had told Plaintiff to sign the contracts before Plaintiff was terminated.  Smith withheld this information from Taylor and Uffelman.  A reasonable jury could conclude that Smith knew of Goodyear's involvement but was less than forthcoming in order to provide a justification to terminate the employment of the older employee and to protect the employment of the younger employee.  This presents a sufficient basis to undermine the facts on which Defendant LDN claims to have based its decision.  While the court finds that Plaintiff's age discrimination claims present a very close question on summary judgment, the court nonetheless believes that a reasonable jury could find that the desire to terminate Plaintiff's employment was so that she could be replaced with a younger, more attractive employee and that the proffered reason was a pretext. *See, e.g.*, *Morse v. Southern Union Co.*, 174 F.3d 917, 922-23 (8th Cir. 1999) (upholding jury verdict for plaintiff because the jury reasonably could have

18

concluded that supervisor's stated preference for younger employees motivated the decision to terminate the plaintiff).

Viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Defendants' proffered justification for termination was a pretext.  Accordingly, Defendants' motion for summary judgment regarding liability must be denied.

### B.   Plaintiff's mitigation of damages

Defendants next argue that they are entitled to judgment on Plaintiff's claim for front pay, reasoning that Plaintiff failed to mitigate her damages by withdrawing herself from the labor market.  Defendants reason that Plaintiff did not search for a replacement job between the time from her termination in February 2010 through June 2010 and from December 16, 2011 through the present.  Plaintiff argues that Defendants cannot sustain their burden in demonstrating that Plaintiff failed to mitigate.  The court agrees with Plaintiff that Defendants' efforts fall short to establish their entitlement to summary judgment on this point.

"The purpose of awarding damages in employment discrimination cases is to make the victim 'whole for injuries suffered on account of unlawful employment discrimination.'" *Holocheck v. Luzerne Cnty. Head Start Inc.*, 2007 WL 954308, *13 (M.D. Pa. Mar. 28, 2007) (citing *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998)).  Failure to mitigate damages is an affirmative defense to a claim for money damages under the ADEA for which the employer bears the burden of proof.  *Caufield v. Center Area Sch. Dist.*, 133 F. App'x 4, 10 (3d Cir. 2005).  Where the employer sustains its burden, "any back-pay award to an aggrieved employee will be cut off or reduced beginning at the time of the employee's failure to mitigate and any front-pay award will be foreclosed."  *Id*. at 11 (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 233-34 (1982)).

An employer must ordinarily demonstrate two elements to establish failure to mitigate: (1) substantially equivalent work was available; and (2) the plaintiff's failure to exercise reasonable diligence to obtain the available employment, *Holocheck*, 2007 WL 954308 at *13 (citing *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir. 1995)), or alternatively, the employer can prove that she withdrew entirely from the employment market, *Caufield*, 133 F. App'x at 10-11 (citing *Tubari v. NLRB*, 959 F.2d 451, 454 (3d Cir. 1992)).  "Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the ADEA claimant has been discriminitorily terminated." *Holocheck*, 2007 WL 954308 at *13 (citing *Booker*, 64 F.3d at 866).  An assessment of diligence must be evaluated in light of the individual characteristics of the discharged employee and the job market.

Applying this test, Defendants are not entitled to summary judgment. To their credit, Defendants have submitted a lengthy report of Maria A. Babinetz, which included a recitation of numerous postings of available jobs in the central Pennsylvania newspaper market.  (*See* Doc. 24-5, pp. 17-20 of 72.)  However, this recitation fails to provide the "promotional opportunities, compensation, job responsibilities, working conditions, and status" necessary to gauge whether these positions are "virtually identical" to Plaintiff's position at Defendant LDN. Although each position is presumably within the same field, Plaintiff was employed by Defendant LDN for approximately thirteen years, over which time she undoubtedly increased her compensation and status.  Whether these prospective employers would have offered "virtually identical" terms remains unestablished.

More importantly, even assuming the listed positions were virtually identical, there remains a genuine issue of material fact regarding whether Plaintiff

exercised reasonable diligence in obtaining the available employment.  Despite

Defendants' urging the court to do otherwise, the court interprets Plaintiff's

testimony as establishing that she attempted to obtain employment.  Within the first

month of losing her job, Plaintiff began assembling application materials, including

composing a cover letter, something she had not done in over a decade.  (Doc. 32-3,

p. 15 of 41.)  Plaintiff testified that she regularly looked for job vacancies in different

newspapers, and registered with job posting services such as CareerLink,

askaboutjobs.com, and Monster.com.  (*Id.* at p. 19 of 41.)  Moreover, Plaintiff

applied for various positions during this time and "kept an ear to the ground" to find

openings that were not advertised.  (*See id.* at p. 15 of 41.)  Thus, the court cannot

conclude that the record conclusively establishes that Plaintiff had completely

withdrawn from the labor market or that she failed to exercise reasonable diligence

in obtaining substitute employment.  *Cf. Holocheck*, 2007 WL 954308, *15

(concluding that the plaintiff completely withdrew from the labor market based on

the plaintiff's testimony that she made no effort to obtain substitute employment

either within or outside the field of teaching, had not read through classified ads to

locate a job, nor made inquiries within her field).  Both the veracity of Plaintiff's

testimony related to her job search efforts and the reasonableness thereof to obtain a

job following the termination of her employment are questions better left for the

jury's consideration.  Accordingly, Defendants' request that the court grant judgment

in their favor on Plaintiff's claims for front pay due to Plaintiff's failure to mitigate

her damages must be denied.

## V.          Conclusion

In this matter, the evidence and inferences derivable therefrom, when

viewed in the light most favorable to Plaintiff, create a genuine issue regarding

whether Defendants' proffered legitimate reasons for terminating Plaintiff's

employment was a pretext and that Plaintiff was actually terminated due to her age for purposes of further increasing the young female employees in the advertising sales department at Defendant LDN.  Accordingly, Defendants are not entitled to judgment on the issue of liability and the motion for summary judgment must be denied in that regard.  Moreover, the evidence, when viewed in the light most favorable to the Plaintiff, creates a genuine issue regarding whether Plaintiff exercised reasonable diligence and remained active in the labor market following the termination of her employment.  Accordingly, Defendants are not entitled to judgment on the issue of front pay, and the motion for summary judgment must be denied in that regard.

An appropriate order will issue.

s/Sylvia H. Rambo
United States District Judge

Dated:  August 13, 2014.